Guy Ruttenberg, Bar No. 207937
guy@ruttenbergiplaw.com
Bassil Madanat, Bar No. 285280
bassil@ruttenbergiplaw.com
RUTTENBERG IP LAW,
A PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260

*Attorneys for Plaintiff Armen Mardiros*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMEN MARDIROS, *an individual*,<br><br>                    Plaintiff,<br><br>          v.<br><br>CITY OF HOPE, *a California nonprofit corporation*.<br><br>                    Defendant. | Case No. 2:19-cv-2196<br><br>**COMPLAINT FOR:**<br>**(1) BREACH OF CONTRACT;**<br>**(2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING;**<br>**(3) DECLARATORY JUDGMENT OF RIGHTS AND OBLIGATIONS UNDER THE IP POLICY;**<br>**(4) CONVERSION;**<br>**(5) BREACH OF FIDUCIARY DUTY;**<br>**(6) PROMISSORY FRAUD;**<br>**(7) CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 9,657,105;**<br>**(8) CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 9,914,909;**<br>**(9) INEQUITABLE CONDUCT;**<br>**(10) DECLARATORY JUDGMENT OF DR. MARDIROS'S OWNERSHIP OF THE '909, '105 AND OTHER PATENTS**<br>**JURY TRIAL DEMANDED** |

# COMPLAINT

Plaintiff Armen Mardiros, Ph.D. ("Dr. Mardiros"), by and through his undersigned attorneys, files this Complaint, and alleges the following:

## NATURE OF ACTION

1.     City of Hope is engaged in a fraudulent scheme to recruit staff based on false promises of transparency and sharing of licensing revenues.  City of Hope recruits talented researchers like Dr. Mardiros by promising that its researchers will share equally in a one-third portion of any moneys or stock received by City of Hope for licensing intellectual property on technology created by the researchers.  City of Hope also promises to use applicable legal principles for determining inventorship among the researchers.  Unfortunately, City of Hope had no intention of complying with its obligations to staffers.  Indeed, City of Hope has been lying to its staffers and cheating them out of millions of dollars in cash and stock earned as a result of those employees' hard work.

2.     Dr. Mardiros is one of three researchers who conceived of patented technology that City of Hope licensed in a deal valued at over $40 million to Mustang Bio, Inc. ("Mustang").  Even so, City of Hope initially paid Dr. Mardiros *nothing*—while Dr. Mardiros very much needed the cash.  Indeed, even though City of Hope *admits* that Dr. Mardiros was owed hundreds of thousands (if not millions) of dollars in cash and stock, City of Hope ignored Dr. Mardiros's demands for over a year and a half until Dr. Mardiros engaged legal counsel.

3.     City of Hope has gone to great lengths to conceal the payments it received and to concoct excuses for failing to pay researchers like Dr. Mardiros.  City of Hope's IP Policies—which are used to recruit staffers like Dr. Mardiros—include a straightforward provision promising to distribute to researchers like Dr. Mardiros one-third of any moneys and stock received by City of Hope for licensing intellectual property rights on inventions created by the researchers.  Among other things, to avoid paying these researchers, City of Hope mischaracterizes much of

the licensing moneys under the misleading title of "Sponsored Research Funding"—even if the funding was provided as a condition of the license—just to create an alibi for refusing to distribute the funds.  In other instances, City of Hope avoids paying researchers like Dr. Mardiros by taking stock in lieu of cash, and then refusing to distribute the stock at all.  In yet other instances, City of Hope tries to go back and retroactively modify its license agreements years later in an attempt to excuse its past misconduct and conceal City of Hope's failure to pay researchers.

4.     City of Hope also takes money from researchers like Dr. Mardiros by fraudulently allocating funds among the various staffers.  City of Hope's internal policies include a straightforward "equal" distribution among researchers who create inventions that are subject to a patent application and then licensed.  City of Hope simply refuses to comply with that requirement.  Indeed, even though Dr. Mardiros was one of three researchers whose technology was licensed under the Mustang deal, City of Hope insists that Dr. Mardiros is entitled to less than 1/18th of the moneys and stock received for that deal.

5.     Perhaps most egregiously of all, City of Hope is also actively defrauding the patent office.  Namely, in order to manipulate the distributions required by its own policies, City of Hope refuses to follow the applicable legal procedures for naming inventors on patents and patent applications.  In one particularly disgraceful example detailed below, City of Hope refused (and still refuses) to name Dr. Mardiros as an inventor on one patent—even though City of Hope only obtained the patent by showing the Examiner that Dr. Mardiros's contribution is novel over the prior art.  Worse yet, despite clear rules from the patent office requiring City of Hope to disclose any inventorship disputes, City of Hope refused even to tell the patent office that Dr. Mardiros purports to be an inventor of the claimed technology.

6.    City of Hope's long-standing wrongful conduct is set forth in more detail below.  Dr. Mardiros brings this action to remedy those wrongs.

7.    This is an action for breach of contract, fraud, breach of fiduciary duty and correction of inventorship under 35 U.S.C. § 256 with respect to United States Patent Nos. 9,657,105 and 9,914,909, among other claims.

## PARTIES

8.    Plaintiff Dr. Mardiros is an individual residing in Glendale, California.

9.    Defendant City of Hope is a nonprofit corporation organized and existing under the laws of California, having its principal places of business in Duarte, California.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction for this action pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court also has supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367.

11.    There is an active case and controversy surrounding inventorship of two patents.  Dr. Mardiros has been and continues to be injured by City of Hope's failure to name inventors correctly on those two patents.  Among other things, City of Hope has used the number of inventors named on each patent for purposes of allocating (or not allocating) revenues and stock to inventors, including Dr. Mardiros.  Under the formulation used by City of Hope (and without admitting that such formulation is correct), correcting inventorship as sought herein would result in additional moneys and stock paid to Dr. Mardiros.  Therefore, Dr. Mardiros has standing to bring claims to correct inventorship of these patents under 35 U.S.C. § 256.

12.    Further, the wrong inventorship also injures Dr. Mardiros's reputation (as detailed below), which further affords him standing to seek correction of inventorship under 35 U.S.C. § 256.

13.    This Court has personal jurisdiction over City of Hope because, among other things, City of Hope is a corporation organized and existing under the laws of California, with its principal place of business in this Judicial District.

14.    Venue is proper under 28 U.S.C. §§ 1391 (b) and (c) because, among other things, City of Hope has a principal place of business in this Judicial District. In addition, a substantial part of the events or omissions giving rise to Dr. Mardiros's claims occurred in this Judicial District, and a substantial part of the property that is the subject of this action is situated in this Judicial District.

## FACTUAL BACKGROUND

### Dr. Mardiros Contributed to the Inventions Claimed in City of Hope's Patents

15.    Dr. Armen Mardiros is an innovative scientist who has devoted his life's work to researching cures for cancer.  His research has contributed to the development of new clinical treatments for cancer patients with poor prognoses.

16.    In 2009, Dr. Mardiros enrolled as a graduate student at City of Hope and joined Dr. Stephen Forman's lab group ("Forman Lab") as a graduate student researcher within City of Hope.

17.    By enrolling at City of Hope, Dr. Mardiros became a professional staff member employed by City of Hope.

18.    On or about May 1, 1987, City of Hope implemented a "newly formulated intellectual property agreement,"  as set forth in City of Hope's "May 1, 1987 Restatement of City of Hope Policy Regarding Intellectual Property" ("IP Policy").

19.    City of Hope incorporated its IP Policy into City of Hope's employment agreements with professional staff members, such as Dr. Mardiros.

20.    The IP Policy purports to "encourage the practical application of new knowledge while maintaining an environment of investigator independence."

21.    The IP Policy requires City of Hope professional staff members to assign all intellectual property developed during the course of their employment to City of Hope, and in return City of Hope agrees to provide those staff members with a portion of any associated licensing revenue.

22.    Section 6.2(a) of the IP Policy requires that City of Hope distribute "one-third" of any "money or stock received by the City of Hope for the transfer of intellectual property . . . as personal income to the staff member(s) who created the intellectual property.  If a plurality of staff members are involved and a United States patent application is filed, each staff member named as an inventor on such application shall share equally in such monies."

23.    According to Section 7 of the IP Policy, "[t]he identification of inventor(s) to be named on a United States patent application shall be determined by application of the principles set forth in the applicable statutes and appropriate legal decisions."

24.    City of Hope's IP Policy also includes an Agreement Concerning Intellectual Property, which is attached to the IP Policy.

25.    Section VI of the Agreement Concerning Intellectual Property states that "contracts with third parties pertaining to intellectual property, including commercial organizations funding research, shall be between such organization and [City of Hope] and that negotiations for such contracts shall not proceed without the knowledge of the involved investigator."

26.    Dr. Mardiros qualifies as an "investigator" under the IP Policy and Agreement Concerning Intellectual Property.

27.    As a graduate student at City of Hope, Dr. Mardiros researched the potential for chimeric antigen receptor (CAR) cell therapy to treat brain and blood cancers, which included genetically engineering immune cells to efficiently locate and target cancer cells.

28.     For example, Dr. Mardiros focused on altering the non-signaling region of CAR molecules known as a "spacer."

29.     Among other things, Dr. Mardiros hypothesized that the CAR molecules the Forman Lab researched were losing efficacy due to unintended cell interactions.

30.     As a solution, in or around 2011, Dr. Mardiros proposed (among other things) including an L235E mutation (changing the amino acid from Leucine to Glutamic Acid) in the CAR molecules' spacer in an effort to alter the molecules' undesirable interactions with Fc receptor (FcR) expressing cells.

31.     Dr. Mardiros met with other City of Hope scientists, including Dr. Christine Brown, to discuss his proposed mutation contribution, including the L235E mutation in the CAR molecules' spacer.

32.     Dr. Mardiros also focused on optimizing the spacers for a variety of CAR molecules in order to demonstrate that the L235E mutation would reduce undesirable interactions, regardless of the specific CAR molecule.

33.     Dr. Mardiros also specifically conceived of optimizing the spacer for the anti-IL13Rα2 CAR, which is a specific CAR molecule with promising clinical potential for treating malignant gliomas.

34.     The anti-IL13Rα2 CAR is structurally and functionally distinct from other CAR molecules, including CAR molecules known as "anti-CD123" and "anti-CD19" CARs.

35.     For example, anti-CD123 and anti-CD19 CARs utilize single chain variable fragments (scFvs) of monoclonal antibodies as their antigen recognition domains and are fused in-frame to T-cell signaling moieties.  In contrast, the anti-IL13Rα2 CAR lacks an scFv and instead utilizes the cytokine IL-13 as its antigen recognition domain.  Such distinctions can significantly change the way the molecule interacts with surrounding cells, and can lead to a completely different

6
COMPLAINT

outcome when used in the context of CAR T-cell therapy. Indeed, such structural distinctions can substantially impact the effectiveness of therapies for patients.

36.    Pursuing the research he suggested, Dr. Mardiros demonstrated that modifying the anti-IL13Rα2 CAR's spacer with the L235E mutation reduced Fc receptor (FcR) mediated interactions without reducing the molecule's ability to target cancer cells. Dr. Mardiros's results were pivotal in the decision to include the L235E mutation in subsequent CAR molecules engineered in the Forman Lab.

37.    Prior to Dr. Mardiros's involvement, no one in the Forman Lab proposed or documented an L235E mutation contribution to the anti-IL13Rα2 CAR.

38.    Another graduate student, Uma Maheswara Jonnalagadda ("Mahesh"), also worked in the Forman Lab around the same time as Dr. Mardiros, although Mahesh was not experiencing the same level of research success as Dr. Mardiros.

39.    For example, Mahesh did not meaningfully contribute to weekly lab meetings or collaborate in the same way as Dr. Mardiros.

40.    For example, graduate students in the Forman Lab routinely provided substantive research updates on a weekly basis. But Mahesh did not provide the Forman Lab with a substantive research update during a lab meeting for many months.

41.    Instead, during this same time period, Mahesh was relegated to bench work and carrying out experiments that were planned by other scientists.

42.    For example, during this same time period, Mahesh conducted work for the CAR spacers involving the L235E mutation conceived by Dr. Mardiros.

43.    City of Hope filed at least three patent applications based on the research of the Forman Lab (including Dr. Mardiros) on CAR T-cell therapy.

44.    *First*, on March 15, 2013, City of Hope filed U.S. Patent App. 13/844,048 (the "'048 Application") for "CD123-Specific Chimeric Antigen

Receptor Redirected T-Cells and Methods of Their Use." The Application Data Sheet filed by City of Hope with the '048 Application identified only Dr. Mardiros and Dr. Forman as co-inventors of the claimed invention.

45.    On March 14, 2014, City of Hope filed Patent Cooperation Treaty ("PCT") Application No. PCT/US2014/029109 (the "'109 PCT Application"), which claims priority to the '048 Application. The '109 PCT Application included a copy of the same Application Data Sheet listing Dr. Mardiros and Dr. Forman as co-inventors.

46.    Mahesh failed to contribute to any of the inventions described in the claims of the '048 Application or the '109 PCT Application.

47.    On information and belief, there are no documents or materials evidencing any inventive contributions by Mahesh to any of the claims of the '048 Application or the '109 PCT Application.

48.    Even so, on June 2, 2016, City of Hope filed a Request to add Mahesh and Dr. Brown as additional co-inventors on the '048 Application.

49.    The '048 Application issued on May 23, 2017, as U.S. Patent No. 9,657,105 (the "'105 Patent").

50.    The '105 Patent incorrectly identifies Mahesh as a co-inventor.

51.    City of Hope is currently the assignee of record for the '105 Patent.

52.    **Second**, on January 13, 2014, City of Hope filed U.S. Provisional Patent App. 61/926,881 (the "'881 Provisional Application") for "Chimeric Antigen Receptors (CARs) Having Mutations in the Fc Spacer Region and Methods for Their Use."

53.    On March 14, 2014, City of Hope filed PCT Application No. PCT/US2014/028961 (the "'961 PCT Application"), which claims priority to the '881 Provisional Application.

54.    On July 13, 2016, City of Hope filed U.S. Patent App. 15/111,384 (the "'384 Application"), which claims priority to the '881 Provisional Application and

the '961 PCT Application.  The application data sheet filed with the '384 Application identifies Dr. Mardiros, Dr. Brown, Dr. Forman and Mahesh as co-inventors of the claimed invention.

55.    As with the '105 Patent, Mahesh failed to contribute to any of the inventions described in the claims of the '384 Application or '961 PCT Application.

56.    On information and belief, there are no documents or materials evidencing any inventive contributions by Mahesh to any of the claims of the '384 Application or '961 PCT Application.

57.    City of Hope is currently the assignee of record for the '384 Application.

58.    **Third**, on September 19, 2014, City of Hope filed U.S. Provisional Patent Application 62/053,068 (the "'068 Provisional Application") for "Costimulatory Chimeric Antigen Receptor T-Cells Targeting IL13Ra2."

59.    On September 18, 2015, City of Hope filed PCT Application No. PCT/US2015/051089 (the "'089 PCT Application"), which claims priority to the '068 Provisional Application.

60.    On May 27, 2016, City of Hope filed U.S. Patent App. No. 15/167,869 (the "'869 Application"), which claims priority to the '068 Provisional Application and the '089 PCT Application.

61.    The '869 Application issued on March 13, 2018, as U.S. Patent No. 9,914,909 (the "'909 Patent").

62.    City of Hope is currently the assignee of the '909 Patent.

63.    The issued '909 Patent names Dr. Forman and Dr. Brown as co-inventors of the claimed invention.

64.    Although he is not named as an inventor on the '909 Patent, Dr. Mardiros's inventive contributions are claimed, including his mutation in the anti-

IL-13Rα2 CAR spacer identified as amino acid Sequence ID Number 10 (SEQ ID NO:10), which is reflected in all claims of the '909 Patent.

### City of Hope Entered into the Royalty-Bearing Mustang License Agreement

65.    On March 17, 2015, City of Hope entered into a licensing agreement (the "Mustang License") with Mustang Therapeutics, Inc., a Delaware corporation with a principal place of business at 3 Columbus Circle, New York, NY, 10019 ("Mustang").  Attached hereto as Exhibit A is a document that, on information and belief, is a true and correct copy of the Mustang License, subject to certain redactions shown in the document.  On information and belief, the redactions shown in Exhibit A were made by or at the direction of Mustang and/or City of Hope.

66.    Under Section 3.1 of the Mustang License, City of Hope grants to Mustang "an exclusive royalty-bearing right and license under the Patent Rights to make, have made, use, offer for sale, sell and import Licensed Products and to perform Licensed Services, in the Field, in the Territory," subject to certain exceptions noted in the same Section  3.1.  The capitalized terms are defined in Article 1 of the Mustang License.

67.    The "Patent Rights" licensed under the Mustang License are defined under Section 1.25 to mean two specific PCT applications and one specific U.S. patent application.  Although the numbers for these specific PCT and U.S. applications are redacted in the publicly available version of the Mustang License, a separate publicly available agreement between City of Hope and Mustang identifies the specified applications as the '961 PCT Application, the '109 PCT Application and the '068 Provisional Application.

68.    The licensed "Patent Rights" are also defined to include unspecified "patents, patent applications, continuation and divisional applications and foreign equivalents that claim the same invention(s) and priority date as the foregoing," "continuation-in-part applications that repeat a substantial portion of any of the

foregoing applications," "Letters Patent or the equivalent issued on any of the foregoing applications throughout the world," and "amendments, extensions, renewals, reissues, and re-examinations of any of the foregoing."

69.     In exchange for and as a condition to receiving the licensed rights, the Mustang License requires Mustang to provide City of Hope (i) a one-time up-front payment, (ii) annual non-refundable licensee maintenance fees, (iii) stock certificates for Class A Common Stock in Mustang, (iv) a first public offering fee at the closing of the first Qualified Public Offering of stock, (v) an additional fee upon any change in control of Mustang, (vi) additional moneys characterized as "Research Funds," (vii) additional milestone payments due after the occurrence of each Milestone Event, (viii) royalties as set forth in the Mustang License, and (ix) sublicense revenues.

70.     The Mustang License does not allocate any specific payment or stock for any particular patent application.  Instead, the Mustang License provides for compensation to City of Hope in exchange for licensing the "Patent Rights" as a whole.

### Dr. Mardiros Notifies City of Hope About Inventorship Issues in the Licensed Patents

71.     Despite its obligation to do so, City of Hope failed to disclose the proper inventors—or even the existence of an inventorship conflict—to the Examiner during prosecution of the '105 and '909 Patents.

*Inventorship Dispute Involving the '909 Patent*

72.     Dr. Mardiros repeatedly notified City of Hope—including in December 2015, March 2016, May 2016, July 2016 and August 2016—that he had been wrongfully omitted as a co-inventor on the then-pending '869 Application (which ultimately issued as the '909 Patent) and that his work on the anti-IL13Rα2 CAR necessitated correction of inventorship.

73.     Among other things, Dr. Mardiros invented the L235E mutated spacer described in amino acid Sequence ID Number 4 (SEQ ID NO:4) in the '909 Patent.

74.     SEQ ID NO:4 is also the amino acid sequence of the spacer domain within the CAR having SEQ ID NO:10 in the '909 Patent.

75.     Claim 1 of the '909 Patent recites the following: "A nucleic acid molecule comprising a nucleotide sequence encoding a chimeric antigen receptor molecule SEQ ID NO:10."

76.     As used in Claim 1 of the '909 Patent, "SEQ ID NO:10" refers to Sequence ID Number 10, which is described in the specification of the '909 Patent.

77.     Sequence ID Number 10 (or SEQ ID NO:10) in the '909 Patent includes SEQ ID NO:4.

78.     City of Hope knows that Dr. Mardiros is an inventor of subject matter claimed in the '909 Patent.

79.     For example, on May 1, 2017, the Examiner in the '869 Application issued an Office Action requiring City of Hope "to re-write the claims to contain only SEQ ID NO:10 (chimeric antigen receptor . . . ) and SEQ ID NO:4 (Spacer . . .) for the purpose of examination."

80.     In its August 1, 2017 reply to the May 1, 2017 Office Action regarding the '869 Application (the "August 1, 2017 Reply"), City of Hope amended the claims and drafted new ones, with the following explanation: "New claims 46-58 are limited to SEQ ID NO:10 solely to comply with the Examiner's requirement.  Applicant has not included claims specifically to SEQ ID NO:4 because it is the amino acid sequence of the spacer domain within the CAR having SEQ ID NO:10."

81.     In its August 1, 2017 Reply, City of Hope also specifically pointed to Dr. Mardiros's amino acid mutation in the spacer of SEQ ID NO:4 (and therefore, SEQ ID NO:10) to demonstrate a distinction over the prior art and to overcome a Section 102 rejection by the Examiner.

82.    Specifically, in its August 1, 2017 Reply, City of Hope pointed at least to "position 129" in an effort to distinguish SEQ ID NO:10 claimed in the '869 Application over the prior art.

83.    As described in City of Hope's August 1, 2017 Reply, "position 129" specifically refers to the L235E mutation that Dr. Mardiros added to the anti-IL13Rα2 CAR, which is claimed in the '869 Application.

84.    In its August 1, 2017 Reply, City of Hope argued that, due to that distinct L235E mutation at position 129, the prior art "cannot anticipate the present claims."

85.    Dr. Mardiros conceived of the L235E mutation at position 129 referenced in City of Hope's August 1, 2017 Reply.

86.    At least as early as August 1, 2017, City of Hope was aware that Dr. Mardiros contributed to and conceived of the L235E mutation at position 129 referenced in City of Hope's August 1, 2017 Reply.

87.    Accordingly, at least as early as August 1, 2017, City of Hope determined that Dr. Mardiros is an inventor of the technology claimed in the '869 Application.

88.    City of Hope did not at any time disclose to the USPTO that Dr. Mardiros conceived of the L235E mutation at position 129 that is referenced in City of Hope's August 1, 2017 Reply.

89.    City of Hope did not at any time disclose to the USPTO that Dr. Mardiros is an inventor on any subject matter claimed in the '869 Application or the '909 Patent.

90.    At the time of its August 1, 2017 Reply, City of Hope was aware that Dr. Mardiros specifically requested to be named as an inventor on the '869 Application, at least because of his L235E mutation contribution, reflected at least in position 129 of SEQ ID NO:10.

91. The PTO ultimately agreed with the arguments set forth in City of Hope's August 1, 2017 Reply.

92. In response to City of Hope's August 1, 2017 Reply, the Examiner allowed all of the pending claims without any further remarks, argument or amendments from City of Hope.

93. On November 8, 2017, in allowing the pending claims in the '869 Application, the Examiner issued a Notice of Allowance, explaining that "[t]he claimed invention reciting a nucleic acid molecule encoding a chimeric antigen receptor molecule comprising the amino acid sequence of SEQ ID NO:10 has not been taught, suggested or anticipated by the prior art."

94. Despite repeated notifications by Dr. Mardiros that the '869 Application includes his invention, and despite its own acknowledgment that Dr. Mardiros's contribution helped the '869 Application overcome prior art, City of Hope failed to add Dr. Mardiros as a named inventor on the '909 Patent.

95. At a minimum, during prosecution of the '869 Application, City of Hope knew that Dr. Mardiros contends that he is an inventor with respect to the subject matter claimed in the application, which ultimately issued as the '909 Patent.

96. During prosecution of the '869 Application, Dr. Mardiros told at least Anita Meiklejohn, Craig Countryman, George Megaw and Sangeeta Cook that he believes himself to be one of the inventors on the subject matter claimed in the application, which ultimately issued as the '909 Patent.

97. Dr. Mardiros also substantiated his position in written correspondence to City of Hope officials on various occasions between 2015 and 2016.

98. On November 11, 2016, Dr. Mardiros (acting through counsel) wrote to City of Hope's counsel (Craig Countryman of the law firm of Fish & Richardson P.C.) and informed him that Dr. Mardiros "continues to believe that he should be named as an inventor on the IL13 patent . . . ." Dr. Mardiros (acting

through counsel) also proposed submitting an explanation to the Examiner for the '869 Application "so that the Examiner could evaluate these inventorship issues."

99.   Even so, City of Hope never informed the Examiner for the '869 Application that Dr. Mardiros contends that he is an inventor with respect to the subject matter claimed in the '909 Patent.

### Inventorship Dispute Involving the '105 Patent

100.   Similarly, City of Hope failed to disclose the correct inventors with respect to the '105 Patent.

101.   In or around early 2016, Dr. Mardiros learned that City of Hope was considering adding Mahesh as a named inventor on the then-pending '048 Application, which ultimately issued as the '105 Patent.

102.   Dr. Mardiros repeatedly notified City of Hope—including in March 2016, May 2016 and July 2016—that Mahesh did not conceive any part of the inventions claimed in the then-pending '048 Application and that he should not be named as an inventor on the '105 Patent that issued from that application.

103.   For example, during prosecution of the '048 Application, Dr. Mardiros specifically informed Anita Meiklejohn, Craig Countryman, George Megaw and Sangeeta Cook that Mahesh should not be listed as an inventor.

104.   Ignoring Dr. Mardiros's notifications, on June 2, 2016, City of Hope filed a "Request under Rule 48 correcting inventorship" to add Mahesh as a co-inventor of the invention claimed in the '048 Application.

105.   On information and belief, there are no documents or materials evidencing any inventive contributions by Mahesh that are claimed in the '048 Application.

106.   Nonetheless, City of Hope (acting through attorney of record Cambria J. Alpha-Cobb from the law firm of Fish & Richardson P.C.) added Mahesh as a co-inventor on the '048 Application despite the fact that he did not conceive of any

part of the invention claimed in the '048 Application or in the later-issued '105 Patent.

107.   On November 11, 2016, Dr. Mardiros (acting through counsel) wrote to City of Hope's counsel (Craig Countryman also of the law firm of Fish & Richardson) and informed him that Dr. Mardiros "continues to believe that . . . Mr. [Mahesh] Jonnalagadda should not be listed as an inventor" on the '048 Application.  Dr. Mardiros (acting through counsel) also proposed submitting an explanation to the Examiner for the "so that the Examiner could evaluate these inventorship issues."

108.   Despite Dr. Mardiros's repeated notifications, City of Hope never removed Mahesh as an inventor on the '048 Application or on the '105 Patent.

109.   Worse yet, City of Hope failed to inform the Examiner of any inventorship conflict.

### City of Hope Breached Its Duty of Candor

110.   Under 37 CFR § 1.56, "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability . . . ."  The obligations imposed by 37 CFR § 1.56 are commonly known as the applicant's "duty of candor."

111.   Rule 2001 of the PTO's "Manual of Patent Examining Procedures" ("MPEP") confirms that "information" that must be disclosed under the applicant's duty of candor includes "inventorship conflicts."

112.   City of Hope did not disclose any inventorship conflict to the Examiner in connection with prosecution of the patent that issued as the '105 Patent.

113.    City of Hope did not disclose any inventorship conflict to the Examiner in connection with prosecution of the patent that issued as the '909 Patent.

## City of Hope Withheld Dr. Mardiros's Cash Royalties

114.    City of Hope also failed to transfer the moneys rightfully belonging to Dr. Mardiros.

115.    Dr. Mardiros did not receive any compensation whatsoever for at least eighteen months after City of Hope executed the Mustang License and received compensation under that agreement.  And as explained below, Dr. Mardiros is still owed a significant amount of compensation.

116.    For example, on information and belief, City of Hope received an "Up-Front Payment" of $2 million under the Mustang License in or around March or April of 2015.

117.    City of Hope conceded that Dr. Mardiros was owed at least $111,111.11 from that initial $2 million Up-Front Payment that City of Hope received under the Mustang License.

118.    Between April 2015 and November 2016, Dr. Mardiros made repeated demands to receive his portion of the "Up-Front Payment."

119.    Between April 2015 and November 2016, Dr. Mardiros and his family experienced significant emotional, physical and financial distress caused by City of Hope's failure to make any payments whatsoever to Dr. Mardiros.

120.    Among other things, between April 2015 and November 2016, Dr. Mardiros and his family lost out on opportunities to purchase a home because they did not receive the money that rightfully belongs to Dr. Mardiros.

121.    Among other things, between April 2015 and November 2016, members of Dr. Mardiros's family experienced significant health issues due to the stress caused by City of Hope's failure to turn over money that rightfully belongs to Dr. Mardiros.

122.    Between April 2015 and November 2016, Dr. Mardiros had to retain and pay for legal counsel in order to demand receipt of money that rightfully belongs to him—even with respect to the amounts that City of Hope conceded were owed to Dr. Mardiros.

123.    City of Hope only paid Dr. Mardiros that $111,111.11 amount on November 2, 2016.

124.    Despite its delay in paying this undisputed amount, City of Hope also refused to pay any interest that accrued on this amount, including under California law.

125.    City of Hope continues to refuse to pay interest on the $111,111.11 amount as of the date of this filing.

126.    Further, that $111,111.11 payment represents only 1/18 of the $2 million Up-Front payment contemplated in the IP Policy, as opposed to the at least 1/9th that Dr. Mardiros is entitled to receive under Section 6.2(a) of the IP Policy.

127.    Through the date of this filing, City of Hope has continued to withhold the outstanding balance of Dr. Mardiros's portion of the Up-Front payment.

128.    Further, on information and belief, City of Hope received additional funds as a condition of the Mustang License, including at least so-called "Research Funding," Milestone Payments, Royalties and Sublicense Revenues.

129.    City of Hope refuses to provide Dr. Mardiros with his portion of these additional amounts received by City of Hope under the Mustang License.

130.    City of Hope refuses to provide Dr. Mardiros with most of his portion of the royalties that City of Hope received under the Mustang License.  To date, City of Hope has also not disclosed the total sum of other royalties it has received, nor has it paid Dr. Mardiros his rightful share of those royalties.

## <u>City of Hope Withheld Dr. Mardiros's Mustang Shares</u>

131.   City of Hope also refused to transfer to Dr. Mardiros his pro rata share of Mustang stock.

132.   On or about March 17, 2015, City of Hope received stock certificates evidencing 1,000,000 shares of Class A Common Stock in Mustang.

133.   City of Hope conceded in October 2016 that, as of March 17, 2015, Dr. Mardiros was at least the equitable owner of 55,556 shares of Mustang stock.

134.   City of Hope later received stock certificates evidencing an additional 293,588 shares of Common Stock in Mustang.

135.   City of Hope has conceded that Dr. Mardiros was the equitable owner of 11,068 of these additional shares of Mustang stock.

136.   Even while disputing the accuracy of these numbers, Dr. Mardiros repeatedly demanded receipt of his shares of Mustang stock.

137.   City of Hope rebuffed Dr. Mardiros's demand to receive the Mustang shares—even for those shares that City of Hope conceded that he owns.

138.   Among the excuses given by City of Hope for its failure to transfer Mustang shares owed to Dr. Mardiros was the contention that the shares were not publicly traded and, therefore, could not be readily transferred to Dr. Mardiros.

139.   In or around August 2017, Mustang began publicly trading its stock on the New York Stock Exchange.

140.   Even after Mustang stock became publicly traded, City of Hope failed to transfer any shares to Dr. Mardiros.

141.   In some instances, City of Hope demanded that Dr. Mardiros provide additional consideration, such as additional warranties and representations and an agreement to indemnify City of Hope, as a condition to receiving the stock that he already owns.

142.   For example, on November 13, 2017, City of Hope demanded that Dr. Mardiros waive additional rights and incur additional obligations before City of

Hope would transfer Dr. Mardiros's Mustang stock to Dr. Mardiros's name, even though such additional obligations are not contemplated in the IP Policy.

143.    City of Hope insisted that it would continue to withhold Dr. Mardiros's shares, declaring that "[i]f he'd prefer not to satisfy the conditions, that's fine. We'll keep the shares."

144.    Even when Dr. Mardiros communicated to City of Hope that he desires to sell his stock at the then-prevailing market rate, City of Hope still refused to transfer the stock or pay Dr. Mardiros for the value of the stock.

145.    By refusing to transfer the shares it conceded were owed to Dr. Mardiros, City of Hope became a constructive trustee of the shares.

146.    As a constructive trustee of Dr. Mardiros's Mustang shares, City of Hope owed a fiduciary duty of care to Dr. Mardiros.

147.    By virtue of this fiduciary duty, City of Hope was required to act in the utmost good faith towards Dr. Mardiros and to avoid acts and omissions adverse to Dr. Mardiros's business interests.

148.    To date, City of Hope still has not provided Dr. Mardiros with his full rightful portion of the 1 million shares of Mustang stock.

149.    City of Hope still has not provided Dr. Mardiros with his full rightful portion of the approximately 293,588 additional shares of Mustang stock received pursuant to the Mustang License.

150.    In or around the first half of 2017, City of Hope purported to re-state or restructure the Mustang License.

151.    On information and belief, there is no new consideration supporting the purported modifications to the Mustang license.

152.    On information and belief, City of Hope purported to restructure and/or re-state the Mustang License (at least in part) in response to Dr. Mardiros's contentions and to further evade its obligations to Dr. Mardiros.

# COUNT 1

## Breach of Contract

153.    Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

154.    Dr. Mardiros and City of Hope are parties to the IP Policy, which is valid, enforceable and supported by adequate consideration.

155.    Dr. Mardiros contributed to the inventions claimed in the '105 and '909 Patents, as well as the '384 Application.

156.    Dr. Mardiros substantially complied with his obligations under the IP Policy and/or was precluded from doing so by City of Hope.

157.    City of Hope breached the IP Policy by failing to provide Dr. Mardiros with his full rightful portion of the $2 million Up -Front payment received under the Mustang License, in violation of Section 6.2(a) of the IP Policy.

158.    City of Hope breached the IP Policy by failing to provide Dr. Mardiros with his full rightful portion of the Mustang shares received under the Mustang License, in violation of Section 6.2(a) of the IP Policy.

159.    City of Hope breached the IP Policy by failing to provide Dr. Mardiros with his full rightful portion of the maintenance and royalty payments received under the Mustang License, in violation of Section 6.2(a) of the IP Policy.

160.    City of Hope breached the IP policy by failing to provide Dr. Mardiros with his full rightful portion of the annual funds it received under the Mustang License, in violation of Section 6.2(a) of the IP Policy.

161.    Even as to the limited amounts it ultimately provided, City of Hope delayed such payments for over a year and a half and only paid undisputed amounts after Dr. Mardiros engaged legal counsel.

162.    City of Hope also breached at least Section VI of the associated Agreement Concerning Intellectual Property by failing to inform Dr. Mardiros in or around early 2017 (shortly before Mustang's shares became public), that City of

Hope purported to restructure the Mustang License that contemplates technology he worked on.

163.   On information and belief, City of Hope restructured the Mustang License in an attempt to carve out and decrease Dr. Mardiros's share in royalties stemming from the agreement.

164.   Each of the above-referenced breaches of the IP Policy was material.

165.   As a direct and proximate result of each of the above-referenced breaches, Dr. Mardiros has suffered and will continue to suffer significant damages.

166.   Among other things, Dr. Mardiros is entitled to receive all stock and payments owed to him under the IP Policy, as well as interest on unpaid amounts and on undisputed amounts that were delayed.

167.   Among other things, Dr. Mardiros is entitled to receive his attorney fees incurred in enforcing his rights to money and stock under the IP Policy, at least because such fees are a foreseeable consequence of City of Hope's breaches of the implied covenant of good faith and fair dealing, including with respect to its failure to pay Dr. Mardiros moneys and stock City of Hope concedes Dr. Mardiros is owed.

168.   Among other things, Dr. Mardiros is entitled to compensation for the physical, emotional and financial losses and distress caused by City of Hope's breaches, including with respect to its failure to pay Dr. Mardiros moneys and stock City of Hope concedes Dr. Mardiros is owed.

169.   In addition, as a result of City of Hope's breaches, Dr. Mardiros should be relieved of his obligations under the IP Policy, including any obligation to assign IP to City of Hope.  Any such prior assignments should be rescinded as a result of City of Hope's breaches.

## COUNT 2

### Breach of the Implied Covenant of Good Faith and Fair Dealing

170.    Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

171.    Dr. Mardiros and City of Hope are parties to the IP Policy, which is valid, enforceable and supported by adequate consideration.

172.    Dr. Mardiros substantially complied with his obligations under the IP Policy and/or was precluded from doing so by City of Hope.

173.    Any and all conditions required for City of Hope's performance under the IP Policy occurred and/or were satisfied.

174.    The purpose of the IP Policy was to recruit top talent like Dr. Mardiros and incentivize them to innovate.

175.    As part of the IP Policy, City of Hope touted—and Dr. Mardiros expected—that an inventor would receive his or her pro rata share of compensation received by City of Hope for licensing that inventor's technology in a deal such as the Mustang License.

176.    Dr. Mardiros further expected that City of Hope would provide such payments owed in a timely manner.

177.    Dr. Mardiros also expected that City of Hope would adequately represent the inventorship of the inventions to the PTO.

178.    City of Hope has unfairly interfered with Dr. Mardiros's right to secure the benefits of the IP Policy.

179.    Among other things, City of Hope failed to provide any portion of Dr. Mardiros's payment in a timely manner and further refused to provide future payments in a timely manner.

180.    City of Hope has still failed to provide Dr. Mardiros with his pro rata share of the money and stock received under the Mustang License for the transfer of intellectual property that Dr. Mardiros developed.

181.    City of Hope has still failed to properly account for the revenues derived from the Mustang License as it pertains to the intellectual property Dr. Mardiros developed.

182.    City of Hope refused to provide Dr. Mardiros with any of the stock received under the Mustang License—including the stock that City of Hope admits Dr. Mardiros is entitled to receive.

183.    City of Hope failed to disclose the receipt of such stock to Dr. Mardiros, nor did it disclose receipt of additional stock.  When Dr. Mardiros demanded his stock, City of Hope demanded that Dr. Mardiros provide further promises and representations in order to receive the stock that was his—including (for example) a demand that Dr. Mardiros indemnify City of Hope.  Ultimately, City of Hope purported to sell Dr. Mardiros's stock at a price that Dr. Mardiros did not agree to accept—and, in fact, refused to accept.

184.    City of Hope failed to provide accurate information to the PTO regarding inventorship or the disputes concerning inventorship with respect to the '105 and '909 Patents.  Even though the applicable procedures and regulations require City of Hope to disclose such inventorship disputes to the PTO Examiner—and even though Dr. Mardiros asked City of Hope to disclose the inventorship dispute and present the issue to the PTO Examiner—City of Hope refused to do so.

185.    For over a year and a half, City of Hope refused to provide any compensation whatsoever to Dr. Mardiros until he expended significant resources engaging legal counsel in 2016 and—even then—City of Hope refused to comply with its straightforward obligations.

186.    City of Hope's conduct violates the implied covenant of good faith and fair dealing. Indeed, such conduct violates the spirit of the agreement and hinders the intent of the parties as contemplated by the IP Policy.

187. As a direct and proximate result of City of Hope's breaches of the implied covenant of good faith and fair dealing, Dr. Mardiros has suffered and will continue to suffer significant damages.

188. Among other things, Dr. Mardiros is entitled to receive all stock and payments owed to him under the IP Policy, as well as interest on unpaid amounts and on undisputed amounts that were delayed.

189. Among other things, Dr. Mardiros is entitled to receive his attorney fees incurred in enforcing his rights to money and stock under the IP Policy, at least because such fees are a foreseeable consequence of City of Hope's breaches of the implied covenant of good faith and fair dealing, including with respect to its failure to pay Dr. Mardiros moneys and stock City of Hope concedes Dr. Mardiros he is owed.

190. Among other things, Dr. Mardiros is entitled to compensation for the physical, emotional and financial losses and distress caused by City of Hope's breaches of the implied covenant of good faith and fair dealing, including with respect to its failure to pay Dr. Mardiros moneys and stock City of Hope concedes Dr. Mardiros is owed.

191. In addition, as a result of City of Hope's breaches, Dr. Mardiros should be relieved of his obligations under the IP Policy, including any obligation to assign IP to City of Hope. Any such prior assignments should be rescinded as a result of City of Hope's breaches.

## **COUNT 3**

## **Declaratory Judgment of Rights and Obligations Under the IP Policy**

192. Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

193. An actual controversy has arisen and now exists between Dr. Mardiros and City of Hope concerning City of Hope's obligations under Section 6.2(a) of the IP Policy.

194.   Dr. Mardiros desires a judicial determination of his rights, and a declaration that he is owed his full rightful portion of all money and stock received by City of Hope under the Mustang License, pursuant to Section 6.2(a) of the IP Policy.

195.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Dr. Mardiros may ascertain his rights under the IP Policy.

## COUNT 4

## Conversion

196.   Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

197.   Dr. Mardiros is or was the owner and was entitled to immediate possession of personal property, which was converted by City of Hope. The converted property includes cash and shares of Mustang stock.

198.   City of Hope substantially interfered with Dr. Mardiros's possession and control of his property by withholding his royalties, including cash and stock, from the Mustang License, and continues to do so through the date of this filing.

199.   For example, as of approximately March 15, 2015, Dr. Mardiros was the owner of certain common shares of Mustang stock.  Dr. Mardiros subsequently became the owner of additional shares of Mustang stock.  Dr. Mardiros repeatedly demanded the stock he owns, so that he can do with it as he wishes.

200.   City of Hope intentionally and substantially interfered with Dr. Mardiros's possession of his stock, including his ability to sell that stock at the time and price chosen by Dr. Mardiros.

201.   For example, City of Hope refused to transfer any of Dr. Mardiros's stock to Dr. Mardiros's name for years—even with respect to stock City of Hope conceded Dr. Mardiros owns.

202.   Once Dr. Mardiros obtained counsel, City of Hope still refused to transfer any stock—including stock that City of Hope conceded Dr. Mardiros owns—unless Dr. Mardiros complied with certain "conditions" that were never contemplated in the IP Policy.

203.   As a result of City of Hope's unlawful conversion, Dr. Mardiros has suffered and will continue to suffer significant damages in an amount to be proven at trial.

204.   Dr. Mardiros is also entitled to preliminary and permanent injunctive relief ordering the return of his property.

205.   City of Hope has also acted with fraud, oppression and/or malice. Accordingly, Dr. Mardiros also seeks an award of punitive and special damages.

## COUNT 5

## Breach of Fiduciary Duty

206.   Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

207.   On March 17, 2015, City of Hope entered into the Mustang License, from which it received one million shares of common stock.

208.   City of Hope conceded in October 2016 that, as of March 17, 2015, Dr. Mardiros was at least the equitable owner of 55,556 shares of Mustang stock.

209.   Among other excuses, City of Hope contended at the time that transferring shares to Dr. Mardiros was difficult because Mustang's stock was not publicly traded.

210.   In or around August 2017, Mustang's stock became publicly traded on the NASDAQ under the ticker MBIO.

211.   When Mustang's stock became publicly traded, City of Hope received an additional 293,588 "top off" shares of Mustang common stock under the Mustang License.

212.   In the fall of 2017, City of Hope conceded that Dr. Mardiros is the equitable owner of at least 66,624 shares of Mustang common stock held by City of Hope, including 55,556 of the stock originally received by City of Hope plus 11,068 of the top off shares.

213.   Despite its admission, City of Hope failed to transfer to Dr. Mardiros the shares that he owns.

214.   By refusing to transfer the shares it conceded were owed to Dr. Mardiros, City of Hope became a constructive trustee of the shares.

215.   As a constructive trustee of Dr. Mardiros's Mustang shares, City of Hope owed a fiduciary duty of care to Dr. Mardiros.

216.   By virtue of this fiduciary duty, City of Hope was required to act in the utmost good faith towards Dr. Mardiros and to avoid acts and omissions adverse to Dr. Mardiros's business interests.

217.   City of Hope breached its fiduciary duties to Dr. Mardiros by *inter alia* (a) intentionally stalling the transfer of Dr. Mardiros's Mustang shares after Mustang's stock began publicly trading on the New York Stock Exchange; (b) refusing to sell Dr. Mardiros' shares at the prevailing market price at the time he sought to sell the shares; (c) precluding Dr. Mardiros from selling his own shares at the desired time, and (d) purporting to sell Dr. Mardiros's Mustang shares over his objections and at a significantly lower price than the market price when he originally sought to sell the shares.

218.   On information and belief, City of Hope knowingly and willfully performed all of the aforementioned activities to benefit its own bargaining power pending inventorship disputes with Dr. Mardiros, and at Dr. Mardiros's expense.

219.   As a result of City of Hope's breach of fiduciary duties, Dr. Mardiros has been irreparably injured and has suffered significant monetary damages in an amount to be proven at trial.

220.    City of Hope also acted with fraud, oppression and/or malice. Accordingly, Dr. Mardiros also seeks an award of punitive damages and special damages.

## COUNT 6

## Promissory Fraud

221.    Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

222.    In recruiting Dr. Mardiros to come to City of Hope, Defendant City of Hope promised to perform its obligations and abide by the terms of the IP Policy.

223.    Among other things, as part of its IP Policy, City of Hope promised Dr. Mardiros that "money or stock received by the City of Hope for the transfer of intellectual property" would be distributed "as personal income to the staff member(s) who created the intellectual property."

224.    Among other things, as part of its IP Policy, City of Hope promised Dr. Mardiros that, "[i]f a plurality of staff members are involved and a United States patent application is filed, each staff member named as an inventor on such application shall share equally in such monies."

225.    Among other things, as part of its IP Policy, City of Hope promised Dr. Mardiros that "[t]he identification of inventor(s) to be named on a United States patent application shall be determined by application of the principles set forth in the applicable statutes and appropriate legal decisions."

226.    Dr. Mardiros reasonably relied on these promises to his detriment in deciding to join City of Hope as a researcher.

227.    Each of these promises was important to Dr. Mardiros's decision to join City of Hope.

228.    When City of Hope made these promises and represented that it would abide by the terms of the IP Policy, it did not intend to perform.

229.   City of Hope made these promises with the intention of inducing reliance by Dr. Mardiros for the purpose of obtaining valuable research innovations and patent assignments without having to pay Dr. Mardiros's fair share of future royalties.

230.   Unbeknownst to Dr. Mardiros, when City of Hope made these promises to Dr. Mardiros, it did not intend to distribute "money or stock received by the City of Hope for the transfer of intellectual property" "to the staff member(s) who created the intellectual property."

231.   Indeed, for over a year and a half, City of Hope did not transfer to Dr. Mardiros any money whatsoever from the moneys received by City of Hope under the Mustang License, until Dr. Mardiros engaged legal counsel.

232.   Similarly, City of Hope never transferred to Dr. Mardiros any of the Mustang stock that City of Hope received under the Mustang License.

233.   On the contrary, City of Hope took legal title to all of the stock that it received under the Mustang License.

234.   On information and belief, in executing and negotiating the Mustang License, City of Hope did not disclose to Mustang that portions of the stock received under the Mustang License belong to Dr. Mardiros.

235.   On information and belief, in executing and negotiating the Mustang License, City of Hope did not create a mechanism for transferring title of stock received under the Mustang License to Dr. Mardiros.

236.   On information and belief, when City of Hope promised to distribute stock to staffers like Dr. Mardiros, City of Hope did not have any procedures in place for accomplishing such a stock transfer.

237.   On information and belief, when City of Hope executed the Mustang License, City of Hope did not have any procedures in place for accomplishing such a stock transfer.

238.   Indeed, even after the Mustang shares became publicly traded, City of Hope has never provided Dr. Mardiros with any mechanism for obtaining legal title to his shares, short of executing a new agreement requiring Dr. Mardiros to make additional representations and undertake additional liability, including indemnity obligations to City of Hope.

239.   On information and belief, when making the aforementioned promises to Dr. Mardiros, City of Hope actually intended to withhold moneys and stock from staffers like Dr. Mardiros through a combination of (i) delay tactics, (ii) mischaracterization of funds, (iii) re-stating of agreements, and (iv) selective patent prosecution strategies.

240.   City of Hope's delay tactics are outlined extensively herein, including its failure to pay any cash to Dr. Mardiros for over a year and a half and its refusal to pay any interest, despite that delay.

241.   City of Hope also employs a strategy of mischaracterizing funds to defraud staffers like Dr. Mardiros.

242.   For example, at least $10,000,000 of funds received as a condition of the Mustang License was labeled "Research Funding" in order to conceal the fact that such funds were simply additional "money . . . received by the City of Hope for the transfer of intellectual property" that should otherwise be distributed "as personal income to the staff member(s) who created the intellectual property."

243.   Similarly, City of Hope further sought to cover up its fraud by trying to re-state retroactively its agreement with Mustang.  For example, when Dr. Mardiros sought his share of compensation received by City of Hope under the Mustang License, Dr. Mardiros pointed out that the Mustang License does not allocate any portion of the funds to any particular patent.  On information and belief, City of Hope fraudulent and retroactively attempted to re-state its Mustang License in response to Dr. Mardiros's allegations.

244.   Further, when Dr. Mardiros demanded correction of inventorship as well as his fair share of payments owed under the IP Policy, City of Hope attempted to retaliate against Dr. Mardiros.

245.   For example, City of Hope attempted to minimize the number of patent applications naming Dr. Mardiros and then created an (incorrect) allocation of funds based upon City of Hope's decisions to prosecute such applications.

246.   In at least once instance, City of Hope sought to abandon the '384 Application naming Dr. Mardiros, rather than defend the application.  On information and belief, City of Hope abandoned the application because City of Hope realized that the (appropriate) arguments for defending the validity of pending claims would also re-affirm Dr. Mardiros's contribution to the '909 Patent and sustain his claims for correction of inventorship.

247.   City of Hope also had no intention of performing on its promise that "each staff member named as an inventor on such application shall share equally" where "a plurality of staff members are involved and a United States patent application is filed" on intellectual property.

248.   Instead, City of Hope intended to allocate moneys and stock if, when and how it would choose to do so, without regard to the promises in the IP Policy.

249.   Similarly, City of Hope had no intention of performing its promise to identify inventors to be named on a United States patent application "by application of the principles set forth in the applicable statutes and appropriate legal decisions."

250.   Instead, City of Hope intended to identify inventors based on internal political considerations and retaliation against staffers who seek the compensation owed to them.

251.   As an example of refusing to follow the relevant legal principles, and as explained above, City of Hope refused (and refuses) to add Dr. Mardiros to the '869 Application (which issued as the '909 Patent) even though City of Hope

expressly and knowingly relied on Dr. Mardiros's contribution in overcoming the prior art and persuading the Examiner to the allow the claims.

252.   On information and belief, and unbeknownst to Dr. Mardiros, when City of Hope made the aforementioned promises, it intended to hide the ball regarding how City of Hope actually distributes cash and stock to graduate student researchers and how inventorship on patents is determined.

253.   As late as 2016, City of Hope also continued to re-state these promises in order to induce further compliance by Dr. Mardiros to his detriment.

254.   For example, in or around October 2016, City of Hope re-stated its intention to transfer title of stock to Dr. Mardiros—at least with respect to the stock that City of Hope admitted belongs to Dr. Mardiros.

255.   For example, when City of Hope's representatives met with Dr. Mardiros on November 2, 2016, City of Hope's representatives asked Dr. Mardiros to execute certain patent assignment documents.

256.   At the same time, on November 2, 2016, City of Hope also suggested that Dr. Mardiros check with his accountant to confirm whether he wants to hold title to the Mustang shares that City of Hope was holding in his name.  In order to obtain Dr. Mardiros's continued compliance with his obligations under the IP Policy, City of Hope promised that it would transfer to Dr. Mardiros legal title to his Mustang shares (as required by the IP Policy), should he confirm his desire to hold such title.

257.   On information and belief, City of Hope had no intention of performing that promise even on November 2, 2016.

258.   On information and belief, on November 2, 2016, City of Hope did not have any procedures in place for accomplishing such a stock transfer.

259.   In reliance on these promises—including the original promises when City of Hope recruited him and then re-stated promises in October 2016—Dr. Mardiros executed the assignment documents as requested by City of Hope.

260.   City of Hope failed to perform each of these promises.

261.   Dr. Mardiros has been and continues to be substantially and materially harmed and prejudiced by his reliance on these promises, and by City of Hope's failure to perform these promises.

262.   Dr. Mardiros's reliance was based substantially on these false promises and was a substantial factor in causing him harm.

263.   As a result of this wrongful conduct, City of Hope has been unjustly enriched at the expense of Dr. Mardiros.

264.   City of Hope also acted with malice, oppression, and fraud, justifying an award of punitive damages.

## **COUNT 7**

### **Correction of Inventorship for U.S. Patent No. 9,657,105, 35 U.S.C. § 256**

265.   Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

266.   There is an active case and controversy involving inventorship of the '105 Patent and Dr. Mardiros has standing to assert a claim for correction of inventorship.

267.   Among other things, City of Hope has used the number of inventors named on the '105 Patent for purposes of allocating revenues to inventors, including Dr. Mardiros.

268.   Under the formulation used by City of Hope (and without admitting that such formulation is correct), correcting inventorship to remove Mahesh as a co-inventor on the '105 Patent would result in additional moneys and stock paid to Dr. Mardiros.

269.   Dr. Mardiros conceived of and/or contributed to the conception of inventions claimed in the '105 Patent.

270.   Dr. Mardiros is a co-inventor of subject matter claimed in the '105 Patent.

271.   Mahesh did not jointly conceive of and/or contribute to conception of any inventions claimed in the '105 Patent.

272.   City of Hope wrongfully added Mahesh as a co-inventor on the '105 Patent.

273.   Inventorship on the '105 Patent should be corrected under 35 U.S.C. § 256 to remove Mahesh as a named inventor.

274.   This case is also exceptional under 35 U.S.C. § 285 at least because of City of Hope's inequitable conduct described herein.  Accordingly, Dr. Mardiros is also entitled to an award of reasonable attorneys' fees, expenses, expert fees and other costs incurred in this action.

## COUNT 8

## Correction of Inventorship for U.S. Patent No. 9,914,909, 35 U.S.C. § 256

275.   Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

276.   There is an active case and controversy involving inventorship of the '909 Patent and Dr. Mardiros has standing to assert a claim for correction of inventorship.

277.   Among other things, City of Hope has used the number of inventors named on the '909 Patent for purposes of allocating revenues to inventors, including its failure to pay certain money and stock to Dr. Mardiros.

278.   Under the formulation used by City of Hope (and without admitting that such formulation is correct), correcting inventorship to add Dr. Mardiros as a co-inventor on the '909 Patent would result in additional moneys and stock paid to Dr. Mardiros.

279.   In addition, Dr. Mardiros has a reputational interest in being named as an inventor on the '909 Patent.  Dr. Mardiros has built an impressive resume based on his work, including the inventions claimed in the '909 Patent.  Omitting him from the patent impairs that reputation.

280.   Dr. Mardiros jointly conceived of and/or contributed to the conception of subject matter claimed in the '909 patent.

281.   Dr. Mardiros is a co-inventor of subject matter claimed in the '909 patent.

282.   Dr. Mardiros was omitted as a named inventor on the '909 patent without any fraud on his part.

283.   Inventorship on the '909 patent should be corrected under 35 U.S.C. § 256 to reflect Dr. Mardiros as a named inventor.

284.   This case is also exceptional under 35 U.S.C. § 285 at least because of City of Hope's inequitable conduct described herein.  Accordingly, Dr. Mardiros is also entitled to an award of reasonable attorneys' fees, expenses, expert fees and other costs incurred in this action.

## COUNT 9

## Inequitable Conduct

285.   Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

286.   Each person involved in prosecution owed a duty of candor to the Examiner during prosecution of the application that ultimately issued as the '909 Patent.

287.   Each person involved in prosecution owed a duty of candor to the Examiner during prosecution of the application that ultimately issued as the '105 Patent.

288.   Among other things, each person involved in prosecution had a duty to notify the Examiner of any inventorship conflicts.

289.   During prosecution of the application that ultimately issued as the '909 Patent, various City of Hope individuals who were involved in prosecuting the application were aware of an inventorship conflict.

290.    During prosecution of the application that ultimately issued as the '105 Patent, various City of Hope individuals who were involved in prosecuting the application were aware of an inventorship conflict.

291.    For example, Mr. George Megaw, Dr. Anita Meiklejohn, Mr. Craig Countryman, Ms. Sangeeta Cook and Dr. Cambria J. Alpha-Cobb were involved in prosecuting the application that ultimately issued as the '909 Patent.

292.    Mr. George Megaw is and was (at all relevant times) working at City of Hope as the Director of the Office of Technology Licensing.

293.    Ms. Sangeeta Cook is and was (at all relevant times) working at City of Hope in the Office of Technology Licensing.

294.    Dr. Meiklejohn, Mr. Countryman and Dr. Alpha-Cobb are and were (at all relevant times) outside attorneys prosecuting patents for City of Hope, including the '909 Patent.

295.    Each of Mr. Megaw, Dr. Meiklejohn, Mr. Countryman, Ms. Cook and Dr. Alpha-Cobb owed a duty of candor to the Examiner during prosecution of the patent that ultimately issued as the '909 Patent.

296.    Each of Mr. Megaw, Dr. Meiklejohn, Mr. Countryman, Ms. Cook and Dr. Alpha-Cobb was also aware of an inventorship conflict with respect to the '909 Patent during prosecution of the patent.

297.    Dr. Mardiros repeatedly notified City of Hope, including each of Mr. Megaw, Dr. Meiklejohn, Ms. Cook and Mr. Countryman that he had been wrongfully omitted as a co-inventor on the '909 Patent and that his work on the anti-IL13Rα2 CAR necessitated correction of inventorship.

298.    On information and belief, Dr. Alpha-Cobb also learned of Dr. Mardiros's contentions concerning inventorship of the '909 Patent from others.

299.    Despite these repeated notifications, City of Hope (including Mr. Megaw, Dr. Meiklejohn, Mr. Countryman, Ms. Cook and Dr. Alpha-Cobb) failed

to inform the Examiner that Dr. Mardiros contends that he should be named as an inventor on the '909 Patent.

300.    City of Hope (including Mr. Megaw, Dr. Meiklejohn, Mr. Countryman, Ms. Cook and Dr. Alpha-Cobb) did not disclose any inventorship conflict to the Examiner in connection with prosecution of the patent that issued as the '909 Patent and, thereby, breached the duty of candor.

301.    Indeed, during prosecution of the application that ultimately issued as the '909 Patent, Dr. Mardiros (acting through counsel) reminded City of Hope of its obligation to disclose the inventorship conflict and proposed that it do so. Dr. Mardiros specifically suggested that he be entitled to present his views of inventorship to the Examiner. Even so, City of Hope did not disclose any such information or even the existence of a dispute to the Examiner.

302.    On information and belief, other individuals involved with a duty of disclosure were also aware during prosecution of the '909 Patent of Dr. Mardiros's contention that he should be named as an inventor, and these other individuals withheld that information from the Examiner.

303.    The various individuals noted above withheld from the Examiner, during prosecution of the application that issued as the '909 Patent, that Dr. Mardiros contends he should be named as an inventor, despite knowing that such information is material and should be disclosed. These individuals withheld the information with intent to deceive the Examiner.

304.    Indeed, in an August 1, 2017 Reply to an office action concerning the '869 Application (which ultimately issued as the '909 Patent), City of Hope distinguished the prior art at least by pointing to "position 129"—which specifically refers to the L235E mutation that Dr. Mardiros added to the anti-IL13Rα2 CAR claimed in the '869 Application. To overcome a rejection by the Examiner, City of Hope argued that, due to that distinction and others, the prior art "cannot anticipate the present claims."

305.    Accordingly, on information and belief, City of Hope determined that Dr. Mardiros was an inventor of the subject matter claimed in the '869 Application, but failed to disclose this material information to the USPTO.

306.    Each of Mr. Megaw, Dr. Meiklejohn, Mr. Countryman and Dr. Alpha-Cobb were also involved in prosecuting the application that ultimately issued as the '105 Patent.

307.    Dr. Meiklejohn, Mr. Countryman and Dr. Alpha-Cobb are and were (at all relevant times) outside attorneys prosecuting patents for City of Hope, including the '105 Patent.

308.    Each of Mr. Megaw, Dr. Meiklejohn, Mr. Countryman, Ms. Cook and Dr. Alpha-Cobb owed a duty of candor to the Examiner during prosecution of the patent that ultimately issued as the '105 Patent.

309.    Each of Mr. Megaw, Dr. Meiklejohn, Mr. Countryman, Ms. Cook and Dr. Alpha-Cobb was also aware of an inventorship conflict with respect to the '105 Patent during prosecution of the patent.

310.    Dr. Mardiros repeatedly notified City of Hope (including each of Mr. Megaw, Dr. Meiklejohn, Ms. Cook and Mr. Countryman) that Mahesh did not conceive any part of the inventions claimed in the '105 Patent and that he should not be named as an inventor on that patent.

311.    On information and belief, Dr. Alpha-Cobb also learned of Dr. Mardiros's contentions concerning inventorship of the '105 Patent from others.

312.    Ignoring Dr. Mardiros's notifications, City of Hope (acting through Dr. Alpha-Cobb) added Mahesh as a co-inventor to the application that would issue as the '105 Patent despite the fact that he did not conceive of any part of the invention claimed in the '105 Patent.

313.    City of Hope (including each of Mr. Megaw, Dr. Meiklejohn, Mr. Countryman, Ms. Cook and Dr. Alpha-Cobb) did not disclose any inventorship

conflict to the Examiner in connection with prosecution of the patent that issued as the '105 Patent.

314.   Proper inventorship is material to patentability.

315.   On information and belief, other individuals involved with a duty of disclosure were also aware during prosecution of the '105 Patent of Dr. Mardiros's contention that Mahesh should not be named as an inventor, and these other individuals withheld that information from the Examiner.

316.   The various individuals noted above withheld from the Examiner, during prosecution of the application that issued as the '105 Patent, that Dr. Mardiros contends Mahesh should not be named as an inventor, despite knowing that such information is material and should be disclosed.  These individuals withheld the information with intent to deceive the Examiner.

317.   City of Hope (including each of Mr. Megaw, Dr. Meiklejohn, Mr. Countryman, Ms. Cook and Dr. Alpha-Cobb ) misrepresented and/or omitted information material to patentability (including inventorship) of the '105 and '909 Patents from the Examiner.

318.   City of Hope withheld the inventorship dispute with the specific intent to deceive and/or mislead the Examiner for both the '105 and '909 Patents.

319.   City of Hope engaged in inequitable conduct during the prosecution of the patents that would issue as the '105 and '909 Patents.

320.   As a result, the Court should fashion an equitable remedy commensurate with the inequitable conduct described here.

321.   Among other things, because of its inequitable conduct, City of Hope should not be entitled to use the inventorship determinations on the '105 and/or '909 Patents for purposes for apportioning compensation under Section 6.2 of the IP Policy and/or the Mustang License adversely to Dr. Mardiros.

322.   Among other things, because of its inequitable conduct, City of Hope should not be entitled to obtain any assignment from Dr. Mardiros with respect to

his rights under the '105 and/or '909 Patents.  Any previous assignments by Dr. Mardiros with respect his rights to the '105 and/or '909 Patents, or any related patent or application, should be declared null and void.

## COUNT 10

## Declaratory Judgment of Dr. Mardiros's Ownership of the '909, '105 and Other Patents

323.    Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

324.    An actual controversy has arisen and now exists between Dr. Mardiros and City of Hope concerning Dr. Mardiros's ownership of the patents licensed under the Mustang License.

325.    Dr. Mardiros fulfilled his obligations under the IP Policy and yet City of Hope has refused to provide Dr. Mardiros with the compensation he is owed under Section 6.2(a) of the IP Policy.

326.    Because of City of Hope's material breaches, Dr. Mardiros should be relieved of his obligations under the IP Policy, including any obligation to assign IP to City of Hope.

327.    Because of City of Hope's material breaches, any assignment of rights by Dr. Mardiros under the IP Policy should be rescinded and voided.

328.    As set forth herein, City of Hope obtained assignments of rights by Dr. Mardiros through fraud.

329.    Because of the inequitable conduct and other fraud committed by City of Hope with respect to the '909 and '105 Patents, City of Hope is not entitled to any equitable relief involving those patents.  Accordingly, the Court should decline to enforce any obligation on the part of Dr. Mardiros to assign his rights to any of these patents, and the Court should void any previous assignments.

330.    Dr. Mardiros desires a judicial determination of his rights, and a declaration that he is relieved of his assignment obligations under Section 3 of the IP Policy and that any prior assignments of IP to City of Hope are rescinded.

331.    A judicial declaration is necessary and appropriate at this time under the circumstances in order that Dr. Mardiros may ascertain his rights under the IP Policy.

**ADDITIONAL CAUSES OF ACTION RESERVED**

332.    Dr. Mardiros restates and incorporates by reference his previous allegations above, as if fully set forth herein.

333.    Dr. Mardiros is continuing to seek information to ascertain a proper accounting of the money and stock provided under the Mustang License.  Dr. Mardiros reserves the right to amend his Complaint to reflect additional payments subject to disbursement under the IP Policy.

334.    Dr. Mardiros is continuing to investigate whether he was omitted from additional patents, including patents that are related to those specified herein.  He is also continuing to investigate whether there are errors concerning additional named inventors on the relevant patents.  Dr. Mardiros reserves the right to amend his Complaint with respect to such investigations.

335.    Dr. Mardiros also reserves his right to otherwise amend his Complaint and/or add parties, to the extent permitted by the Court's scheduling order and by the Federal Rules of Civil Procedure.

**PRIOR EFFORTS TO RESOLVE THIS MATTER**

336.    Before bringing suit, Dr. Mardiros made extensive good faith efforts to resolve these disputes through out-of-court negotiations.

337.    Among other things, during this time period Dr. Mardiros tried to meet with City of Hope on his own before engaging legal counsel.

338.    On at least two separate occasions, Dr. Mardiros met with City of Hope and its counsel at the offices of Dr. Mardiros's counsel.

339.   Dr. Mardiros and City of Hope also exchanged extensive correspondence as part of their attempts to resolve these claims.

340.   At their meeting on September 17, 2018, the parties also expressly agreed to toll any statute of limitations or other time-related defenses, although such tolling was also implicit by other previous negotiations.

341.   Ultimately, the parties also engaged in an ADR procedure.

342.   The tolling agreement has continued through March 22, 2019.

343.   To the extent relevant, any statute of limitations or other time-based defense was tolled during these negotiations.

## DEMAND FOR JURY TRIAL

344.   Dr. Mardiros hereby demands a jury trial on all claims, damages, and any other issues presented herein that are triable to a jury.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Dr. Armen Mardiros prays that the Court enter judgment against Defendant City of Hope and in favor of Dr. Mardiros as follows:

A.   Enter judgment in favor of Dr. Mardiros on all claims asserted;

B.   Enter judgment finding City of Hope breached Section 6.2(a) of the IP Policy and breached its duty of good faith and fair dealing;

C.   Enter judgment that City of Hope converted Dr. Mardiros's property;

D.   Declare that at least 1/9th of all money and stock provided under the Mustang License—including any so-called "Research Funding," Milestone Payments, Royalties and Sublicense Revenues—belongs to Dr. Mardiros;

E.   Order an accounting of all licensing and other revenues (including so-called "research funding") relating to the Mustang License, including the re-stated 2017 Mustang License.

F.   Award Dr. Mardiros compensatory damages caused by City of Hope's wrongful conduct outlined herein;

G.   Award Dr. Mardiros punitive damages;

H.    Disgorge profits and unjust enrichment that have otherwise accrued to City of Hope as a result of its wrongful conduct outlined above;

I.    Order correction of inventorship on the '105 Patent by removing Mahesh as a named co-inventor;

J.    Order correction of inventorship on the '909 Patent by adding Dr. Mardiros as a named co-inventor;

K.    Declare that the inventorship be so corrected on any related applications or patents;

L.    Declare that Dr. Mardiros has no obligation to assign patents, and that any previous assignments are null and void, with respect to his rights in the '909 Patent, the '105 Patent, the '089 PCT Application, the '961 PCT Application, the '109 PCT Application, the '384 Application, the '881 Provisional Application, the '068 Provisional Application and any related applications or patents or foreign counterparts;

M.    Find that this case is exceptional under 35 U.S.C. § 285 and award Dr. Mardiros his reasonable attorney's fees;

N.    Award Dr. Mardiros's pre-judgment and post-judgment interest to the fullest extent provided by law;

O.    Award Dr. Mardiros his costs to the full extent provided by law; and

P.    Order such other and further relief as the Court deems just and proper.

DATED:  March 22, 2019          By:    _____
                                        */s/ Guy Ruttenberg*

                                        Guy Ruttenberg
                                        guy@ruttenbergiplaw.com
                                        Bassil Madanat
                                        bassil@ruttenbergiplaw.com
                                        RUTTENBERG IP LAW,
                                        A PROFESSIONAL CORPORATION
                                        1801 Century Park East, Suite 1920
                                        Los Angeles, CA 90067
                                        Telephone:  (310) 627-2270
                                        Facsimile:  (310) 627-2260
                                        *Attorneys for Plaintiff*